Yes, Your Honor. It's Claudia Hong, appearing for Petitioner Mohamed Saidani. All right. Thank you. And Ms. Sarko for the government is in the courtroom. So we'll first hear an argument from Ms. Hong. Thank you. May it please the Court. There are three reasons as to why this Court can and should reverse the BIA. The first is that the I.J. did not have a legitimate reason to find Mr. Saidani not credible. The I.J. listed over 20 reasons to find him not credible. However, these inconsistencies were not material and did not go to the heart of the asylum claim. Most of the alleged inconsistencies did not even exist or were based on speculation, mischaracterizations, or distortions of the record. On footnote 4 on page 5 of the opposition brief, the government concedes that this case occurred before the REAL ID Act. It's important to note that the immigration judge's reasons that were given could be a legitimate basis today to deny Mr. Saidani's claim. However, because it happened before the REAL ID Act, there's simply no substantial evidence to support the reasons that the I.J. gave. Turning to the demeanor finding, there's also no basis to find Mr. Saidani's use of multiple translators as a reason to find him not credible. The most important reason is that the I.J., who actually presided over Mr. Saidani's marriage hearings, was not present during these 8 preliminary hearings and did not have any first-hand knowledge or observation of Mr. Saidani during those hearings. The immigration judges that did, did not note any concern and the I.N.S. attorney did not voice any objection to Mr. Saidani's use of different translators. It is therefore improper for the immigration judge to base that reason as one to find that Mr. Saidani did not have a credible demeanor. Turning to the second reason, the I.J. abandoned her role as the neutral fact finder. The nature and the number of distortions and mischaracterizations of the record revealed bias. The immigration judge also improperly rejected credible evidence. Under matter of O.D., the BIA contemplates that one bad document does not necessarily taint all of the others. And in this case, that rule is particularly clear because Mr. Saidani provided an explanation as to why the document sent by his sister was flaudulent. It was different from the others that he presented to the court. There was a forensics report showing that there was no indicia of fraud or irregularities on these other documents. The immigration judge had admitted the other 14 documents. What was the document? Excuse me, Ms. Hong? Yes. Ms. Hong, this is Barry Silverman. What document did the I.J. determine that you agree was fraudulent? It was the one document that Mr. Saidani withdrew. It was the second military summons that was issued in September before he left the country. It purports to be a summons issued to him to report to military duty? Correct. Why wouldn't Mr. Saidani himself know that not to be true, not to be a real document? As explained to the court, he brought some of the documents with him to the country. Some were sent to him after he got here and some were sent by his sister after he arrived in the country. No, I understand he says he got it from his sister. What I don't understand is why he would not recognize it himself as not a valid document. It's not quite clear. I think in part he stated that he just took the document and provided it to his lawyer without much investigation. But, however, once it was revealed, he did notice that it was fraudulent and he confronted her about it and she was too afraid to give a reason as to why it wasn't a legitimate one. Ms. Hong, assuming that some of the inconsistencies mentioned by the I.J. aren't very persuasive, I'd be interested in knowing why you think that it wasn't a cogent reason going to the heart of the claim to talk about whether the tail of his shirt could be lifted over his head while he was handcuffed, whether he could see through the shirt to identify a persecutor, what position he occupied in the military, and whether he picked up his acquittal notice by himself or with others in tow. Well, it's telling that in the government's recitation of the case and in the I.J.'s recitation of the case, when originally describing what happened to Mr. Saidani, those facts were not material in the telling of a story that he had been detained for over three years, he was falsely accused, he was brought to the court, he was acquitted, and he was brutally tortured on numerous occasions to correct his name. Yes, but the point is that if he got such things as the shirt whether he was placed in the trunk or in the back seat of the car wrong, that suggests that none of the rest of it happened, because those incidents occurred at the very beginning of the period of custody. I would contend, though, that the I.J. made conclusions that were based on speculation. She said that it's impossible for his shirt to be brought over his head, but she's assuming that he was wearing a Western-style button-down shirt. A lot of the shirts in Islamic countries actually go down to people's knees. That was never clarified whether he was wearing that type of shirt or a more standard Western shirt, and it's improper for the immigration judge to speculate that it's completely implausible based on omission in the record, and she was filling in the gaps improperly. As regards to the military rank, she said herself it's immaterial, it doesn't matter. When there was a question whether he was a corporal or an office assistant or whether he had a desk job, he said that he had a desk job. It's the rank of an office assistant, and it wasn't a corporal. That was a translation problem occurring in his credible fear interview. The I.J. accepted that explanation at the time that it was given, and then it was unfair for her to turn around and have a decision and said it's highly relevant because he could have persecuted someone. But there was never a question that he did persecute anyone. There was never a charge by the government that the persecutor bar should apply. There was never a question that he was engaged in any activity or the Algerian military was engaged in any activity that would place that at issue. So it's improper for her to cap that down and have a lot of attenuated steps that were actually not relevant to the case. As to the van and to the car, he explained that in the credible fear interview that it was the backseat of the trunk, and he later said that that was a confusion over that he was placed in the backseat of the trunk when he was brought to the mosque execution, but when he was first abducted, he was placed in the backseat of a car. So what was important, I think I agree with your point, that if these discrepancies had been left unexplained, there would be problems. But he provided a credible explanation for any inconsistencies that did exist, but also a more close examination shows that a lot of these inconsistencies did not exist and were based on distortions or speculation by the immigration judge. Okay, Ms. Harney, you have a little less than two minutes left. Would you like to save that for rebuttal? Yes, Your Honor. Okay. Ms. Sarko? Good morning, Your Honors. My name is Michelle Sarko. I'm here representing the respondent in this matter. Attorney General, keep your voice up, please. I have trouble hearing. Sure. I'm here representing Attorney General Eric Holder in this matter. The issues before the court are whether there's substantial evidence in the record to support the agency's adverse credibility finding and whether the immigration judge acted properly and did not violate any of the due process rights of the petitioner in this case. I would start out by noting that there were multiple reasons for the immigration judge to find that the petitioner was not credible in this case, starting with the discussion about his original initial detention and whether he was put in the trunk of a car or a van, as he said in his credible fear interview, or whether he was put in the back seat of a car. Didn't he come forward and say that there was a mistake in how his first report was reported? He did say that. What reason do we have to disbelieve that? Well, I would have to look at the thing, but normally in credible fear interviews, what the person says is read back to them, and then they note whether what's transcribed down, taken down in the interview is correct or not. And so he would have had the chance at that time to say that that was incorrect. Let me ask you, do you defend every one of the IJ's adverse credibility findings? We do, although we note that the court doesn't have to find that each one is supported by credible evidence, as long as some of them are or even just one of them is, that's enough to support an adverse credibility finding in this case. How would we know? Let's just say we don't agree with several of them. How would we know that the judge didn't take the improper ones into account and kind of looked at sort of a holistic evaluation of his credibility and took into account things that were not really inconsistent or that bear on his credibility properly? Well, I would say that the petitioner, I believe, to the board, argued each one individually. And so the board, in reviewing the immigration judge's decision, would be able to make its own determination as to whether there was even one ground that was supported. And under the Ninth Secret Case Law, all you need is one ground to support the adverse credibility finding. Do you defend her finding regarding the water on the floor? Yes. When he first testified, he said he walked into the room and that there was water on the floor and that they were using a manual machine to electrocute him when they were allegedly torturing him. And so then later when they started to question why weren't the person who was conducting the interrogation, why weren't they also electrocuted, then he backtracked and said, oh, well, maybe the water didn't get that far. And then he said, well, I wasn't sure where the water was. And I would also say that the immigration judge noted that his demeanor started to come a little bit undone when that questioning started to happen. And so that also, I think, relates to the demeanor finding of the immigration judge later on. Ms. Hahn made the point that with respect to the shirt, we don't know what kind of shirt it was. It was a buttoned shirt of some sort. Yeah. And I would refer the Court to specific pages in the transcript. I was noting them, pages 283, 284, 285, 286. When he was questioned about that, he said it was a buttoned-down shirt just like the one he was wearing, similar to the one he was wearing in court. They were not identical. Later, they were asking him about the material of what he was wearing. And his counsel described the material of what he was wearing in the court as, I think, a thick woven material. This goes to whether he could see through the shirt? Correct. My understanding is at one point he had a T-shirt on. Underneath. Yeah. And at another occasion when he says he could see through it, he wasn't wearing the T-shirt underneath. Yeah, he did say that, but that's in direct contradiction to having a thick kind of woven shirt. You know, having a thin shirt that you could see through is contradicted by having a thick woven shirt. Also, with regard to having his hands tied behind his back and being able to pull the tail of the shirt over, the immigration judge, being able to actually view the petitioner, and he said it was a similar kind of shirt as he was wearing in the court, would be able to make that determination, even in the courtroom, as to whether it was the type of shirt that could make it all the way over his head with his hands tied behind his back and then pulled down to his stomach on the other side. So I would say that there's some deference owed there to the immigration judge's visual observations in that regard. And I would also note, I think at page 343 of the transcript, later on he appears in court and he said that he was wearing the same shirt as he was earlier when he was first arrested and that he kept the shirt and never changed it. So while he might have changed, you know, I'm sure he didn't stay for however many months he was without ever changing clothes, but it could be that he changed the undergarments and kept the outer shirt, since he appears not to have contact with his family. And there are other significant discrepancies in the record with regard to his military service. Initially, I think in the asylum application, it described his position as an officer's assistant. Later on, when he was testifying, he wanted to correct that and said no, it was a corporal, that there wasn't a position of officer's assistant. And the IJ admitted, well, maybe that's the duties, since he did say he worked with officers at administrative capacity. So the IJ recognized that it might have been the function rather than the title. But the immigration judge was concerned that he changed his description, first started out as officer with no rank, then corporal, and then he said, well, the corporal in the Algerian army is like nothing. It has no responsibilities, no cachet, in other words, no significance. And the immigration judge viewed that as his ever-changing description of what his position was as perhaps an attempt to evade any responsibility with regard to whether he was responsible for being a persecutor or if the Algerian military had engaged in persecution. So that's significant. I would also point to questions about when he went to pick up his acquittal form. He had testified that right before he was dismissed, he had been interviewed with a civilian and previously tortured, and that he was afraid, extremely scared, that he would have to go back. Yet he described that he then went the following week and picked up his acquittal form, first saying that we went and then changing it to, no, I went by myself. So it's inconsistent, sort of implausible or illogical that he would go by himself when he had an attorney who could have picked it up for him, but he was so deftly afraid of going to the court and that he would be picked up again and punished. I would also say that the acquittal documents or none of his documents with regard to his case actually say what the charges were that he was accused of. So that kind of lends them to be suspect, especially in view of the fact that he submitted a prior fraudulent document. I would say I think the record shows that he actually didn't fess up to the document being fraudulent until after he was actually examined by the forensic examiner and determined to be fraudulent. And after that, then it was withdrawn. And with regard to the Real ID Act, I just wanted to point out, yes, most of it does not apply now, but there is one exception, and that's with regard to the corroboration standard. And I think if you look at the timing of it, that provision actually does apply now with regard to whether it's reviewed for substantial evidence. Do you have any more questions? I don't think so. Thank you very much for your time. If I could make a couple points to rebuttal. The first, regarding the we versus I discrepancy, the immigration judge said that at a later time we picked up the document in her decision, but she didn't cite to the record. And in its response brief, the government never provided a citation in the record saying that he actually did say we rather than by himself. That is an example where the IJ, again, just distorted the record to find a discrepancy that didn't exist. Regarding the wet floor, page 33 of my opening brief, there's a citation to Tower v. Ashcroft, which says the general response to questioning, followed by more specific consistent response to further question, is not a cogent reason for supporting a negative credibility finding. He said the floor was wet. On a more directed question, he said just the area around the bench was wet. That is not a basis to find him not credible. Turning to another point, though, I think one of the more disturbing parts or interesting parts about this case is that the FBI conducted an independent investigation of Mr. Saidani, came to his house, asked him whether he was involved with Islamic terrorists, which was based before his asylum claim, and then before the immigration court, the immigration judge refused to order the INS to locate this report and produce it to the court. If we're talking about corroborating evidence, it's patently unfair for one agency of the government to be holding corroborating evidence that Mr. Saidani was accused of being a terrorist by the Algerian government and actually not a terrorist, while the immigration judge denies his claim for lack of corroborating evidence because this was brought to the immigration judge's attention as a due process violation, not to require the INS to produce that document. All right. Thank you, Ms. Hahn. Thank you both, counsel and editor. It's just argued will be submitted and the court will stand adjourned. Thank you.
judges: Hall, Rymer, Silverman